# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

ONE CYPRESS TERMINALS, LLC, )
)
)
Plaintiff, )
)
v. )    C.A. No. 2022-0694-BWD
)
BLUEWING MIDSTREAM, LLC, )
)
Defendant. )

## MASTER'S FINAL REPORT

Date Submitted:  January 5, 2023
Final Report:  March 8, 2023

Raymond J. DiCamillo, Matthew W. Murphy & Jordan L. Cramer, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: Collin J. Cox & Johanna E. Smith, GIBSON, DUNN & CRUTCHER LLP, Houston, Texas; *Attorneys for Plaintiff One Cypress Terminals, LLC*.

Catherine A. Gaul & Michael J. Vail, ASHBY & GEDDES, P.A., Wilmington, Delaware; OF COUNSEL: James G. Munisteri & Rachel K. O'Neil, FOLEY & LARDNER, LLP, Houston, Texas; *Attorneys for Defendant Bluewing Midstream, LLC*.

**DAVID, M.**

This final report addresses Defendant Bluewing Midstream, LLC's Motion for Partial Summary Judgment (the "Motion").[1]

Plaintiff One Cypress Terminals, LLC ("OCT") and Defendant Bluewing Midstream, LLC ("Midstream") are the sole members of non-party Bluewing One HoldCo, LLC (the "Company"), a Delaware limited liability company that owns and operates fuel storage facilities, called "terminals," in Brownsville, Texas. Under the terms of the limited liability company agreement, OCT is entitled to carried interest on Midstream's capital contributions used to expand or improve the Company's initial terminal, the "Bluewing One Terminal," located at 11700 Old Texas Highway 48. In 2019, the Company procured a loan to fund construction at two new locations across the highway. The central question presented by the Motion is whether, under the unambiguous terms of the contract, those new locations are "expansions" of the Bluewing One Terminal, such that OCT is entitled to carried interest, or if they are "other assets adjacent to the Bluewing One Terminal site," such that carried interest is not owed.

For the reasons that follow, I conclude that the LLC Agreement unambiguously compels Midstream's interpretation that these new locations are

---

[1] This case was transferred to me from Vice Chancellor Glasscock after the Motion was fully briefed and the parties presented oral argument. After examining the briefs and oral argument transcript, I concluded that further argument before me was unnecessary.

"other assets adjacent to the Bluewing One Terminal site," and not expansions of the "Bluewing One Terminal" itself. Accordingly, I recommend that the Motion be granted.

## I. BACKGROUND[2]

### A. The Parties

Texas limited liability companies OCT and Midstream are the sole Members of non-party Bluewing One HoldCo, LLC, referred to herein as the "Company." Midstream is also the Managing Member of the Company.

The Company is governed by the Limited Liability Company Agreement of Bluewing One Holdco, LLC by and between Bluewing Midstream, LLC and One Cypress Terminals, LLC dated March 12, 2018 (the "LLC Agreement"). Through its subsidiaries, the Company owns and operates bulk fuel storage facilities, called "terminals," in Brownsville, Texas. These terminals consist of fuel storage facilities with large, above-ground fuel storage tanks and infrastructure to load and unload the tanks. The LLC Agreement defines the Company's "Business" to include "the receipt, redelivery, storage, throughput, and terminalling of hydrocarbons and hydrocarbon-derived products at the Terminals" and "the ownership, operation,

---

[2] Although the parties agree that the LLC Agreement is unambiguous, their briefing in connection with the Motion attaches and cites to numerous documents outside the LLC Agreement. Because the contract language at issue is unambiguous, as explained below, I do not summarize that extrinsic evidence here.

maintenance and management of the Terminals and other assets and properties of the Company and its Subsidiaries."  Verified Compl., Ex. 1 at Section 1.1, Dkt. No. 1 [hereinafter, the "LLC Agreement"].

## B.     The Bluewing Agreement

Prior to the formation of the Company, from approximately 2012 through late 2016, OCT owned and operated a terminal located at 11700 Old Texas Highway 48 in Brownsville, Texas, later termed the "Bluewing One Terminal."  In early 2016, OCT and Midstream began negotiating a transaction involving the Bluewing One Terminal.

In October 2016, the parties memorialized their co-membership in a Delaware limited liability company, Bluewing One, LLC, through an Amended and Restated Limited Liability Company Agreement of Bluewing One, LLC by and between Bluewing Midstream, LLC and One Cypress Terminals, LLC dated October 25, 2016 (the "Bluewing Agreement").[3]  As part of that transaction, OCT contributed the Bluewing One Terminal plus $35,000 in cash, and Midstream contributed

---

[3] As stated in the Bluewing Agreement, Bluewing One, LLC was formed "solely to engage in the Business," defined to include "the receipt, redelivery, storage, throughput, and terminalling of hydrocarbons and hydrocarbon-derived products at the [Bluewing One] Terminal," "the ownership, operation, maintenance and management of the [Bluewing One] Terminal and other assets and properties of the Company," and other "ancillary activities."  Def.'s Mot. for Partial Summ. J., Ex. 2 at Section 2.4 [hereinafter, the "Bluewing Agreement"]; *id.* at Section 1.1 ("Business" definition).

$3,185,000 in cash, to Bluewing One, LLC. Bluewing Agreement at Section 7.1(a)-(b).

The Bluewing Agreement also contemplated that OCT would receive additional consideration in the form of "carried interest" on certain capital contributions made by Midstream. *Id.* at Section 7.2(b)-(c). Through provisions that were later adopted nearly verbatim in the LLC Agreement, the Bluewing Agreement authorizes Midstream, as Managing Member, to issue capital calls for amounts necessary to fund Bluewing One, LLC. *Id.* at Section 7.2(a)(i); LLC Agreement at Section 7.2(a)(i). Bluewing One, LLC's Members, Midstream and OCT, are not required to participate in each capital call, but upon each capital contribution by a Member, the percentage interests of the Members are immediately adjusted by re-calculating the Members' respective percentage interests. Bluewing Agreement at Section 7.2(a)(iv). Notwithstanding that general framework, the Bluewing Agreement further provides that OCT will receive carried interest on capital contributions made by Midstream in order to fund capital expenditures to expand or improve the Bluewing One Terminal, which would have the effect of reducing the amount of funds that OCT would have to contribute in a capital call to maintain its ownership percentage in Bluewing One, LLC. *Id.* at Section 7.2(b)-(c).

4

### C. Capital Calls and Carried Interest Under the LLC Agreement

In 2018, the parties formed the Company under the terms set forth in the LLC Agreement. At that time, the Company became the sole owner of (1) Bluewing One, LLC, which continued to own the Bluewing One Terminal, and (2) a new Delaware limited liability company, Bluewing Royal, LLC, which was formed to acquire a terminal and related facilities located at 1005 Anchor Road in Brownsville, Texas (the "Bluewing Royal Terminal").[4] LLC Agreement at 1 (Recitals).

Like the Bluewing Agreement, the LLC Agreement contemplates that OCT will receive carried interest on certain capital contributions by Midstream. Specifically, the LLC Agreement authorizes Midstream, as Managing Member, to issue capital calls for amounts necessary to fund the Company and its Subsidiaries:

> Capital Calls. Each Member shall have the right, but not the obligation, to make additional Capital Contributions at such times as shall be determined by the Managing Member and communicated by written notice to the Non-Managing Member (a "Capital Call"). Subject to Sections 3.9, 3.10, and 3.11, *the Managing Member may, from time to time, issue Capital Calls for amounts necessary to fund the Company and its Subsidiaries*, including . . . amounts necessary to fund the development and construction of any expansion, modification or other capital expenditures related to any of the Terminals and any other Approved Project . . . provided, however, that, subject to the last sentence of this Section 7.2(a)(i) and Section 7.2(a)(iii), each Member will have the right to fund a portion of the amount requested pursuant

---

[4] The Bluewing One Terminal located at 11700 Old Texas Highway 48 is labeled "A" on Exhibit 1 hereto. The Bluewing One Terminal is adjacent to the Bluewing Royal Terminal, which is located at 1005 Anchor Road and labeled "B" on Exhibit 1 hereto.

to any particular Capital Call equal to such Member's Percentage Interest share of the total amount requested pursuant to such Capital Call.

*Id*. at Section 7.2(a)(i) (emphasis added). While the Company's Members, Midstream and OCT, are not required to participate in the capital calls, upon a capital contribution made by one or both Members, "the Percentage Interest of the Members shall be immediately adjusted by re-calculating (as of such time) the Pro-Forma Percentage Interest of each Member." *Id.* at Section 7.2(a)(iv).

As in the Bluewing Agreement, the LLC Agreement provides that OCT will receive carried interest on capital contributions made by Midstream in order to fund capital expenditures to expand or improve the "Bluewing One Terminal," which is defined as:

> [T]he marine terminal, tank farm and related facilities and infrastructure located at 11700 Old Texas 48, Brownsville, Texas 78521 and serving the Port of Brownsville, Texas to be owned by Bluewing One, as such facility exists as of the Effective Date, and as the same may be expanded, modernized, de-bottlenecked, improved, refurbished, repaired or otherwise modified or altered following the Effective Date . . . .

*Id*. at Section 1.1. Pursuant to Section 7.2(a)(i),

> [T]o the extent (and *only to the extent*) that funds requested pursuant to any Capital Call pertain to capital expenditures *directly and solely related to the Bluewing One Terminal*, then until the thresholds in each of Section 7.2(b) (with respect to the Initial Carried Interest) and Section 7.2(c) (with respect to the Additional Carried Interest) have been achieved, *OCT's right to make Capital Contributions pursuant to such Capital Call shall be automatically reduced by an amount*

6

***equal to the Initial Carried Interest or the Additional Carried Interest***
(as applicable) earned by OCT as a result of Capital Contributions made
by [Midstream] in connection with such Capital Call (it being
acknowledged and agreed among the Members that nothing in Section
7.2(b) or Section 7.2(c) below shall entitle OCT to effect a reduction
in, or otherwise dilute, [Midstream]'s Percentage Interest, relative to
the aggregate amount of all of the Members' Percentage Interest).

*Id.* at Section 7.2(a)(i) (emphasis added). "Initial Carried Interest" and "Additional

Carried Interest" are defined as follows:

(b) <u>Initial Carried Interest</u>. Notwithstanding anything to the contrary in
Section 7.2(a)(i) above, with respect to the first $4,003,788 of Capital
Contributions made by Bluewing after the Effective Date (determined,
for the avoidance of doubt, prior to giving effect to the Capital
Contribution of $1,500,000 that is due on March 23, 2018) ***for the sole
purpose of funding capital expenditures to expand or improve the
Bluewing One Terminal (as opposed to any other expenditures of the
Company, including, but not limited to, those pertaining to the
acquisition of, or expansion or improvements with respect to***, the
Bluewing Royal Terminal, ***any other assets adjacent to the Bluewing
One Terminal site or any other Terminals***), OCT shall be deemed,
contemporaneously with each such Capital Contribution made by
Bluewing, to have made a Capital Contribution equal to twenty percent
(20%) of such Bluewing Capital Contribution, and the Pro-Forma
Percentage Interest of each Member shall adjust accordingly (each such
amount deemed to have been contributed by OCT being referred to as
an "Initial Carried Interest"). . . .

(c) <u>Additional Carried Interest</u>. Without limiting Section 7.2(a)(i)
above, once Bluewing has made Capital Contributions after the
Effective Date equal to $4,003,788 in the aggregate for the sole
purpose of funding capital expenditures related to the Bluewing One
Terminal, then with respect to the next $15,000,000 of Capital
Contributions made by Bluewing ***for the sole purpose of funding
capital expenditures to expand or improve the Bluewing One
Terminal (as opposed to any other expenditures of the Company,
including, but not limited to, those pertaining to the acquisition of, or***

7

*expansion or improvements with respect to, the Bluewing Royal Terminal, any other assets adjacent to the Bluewing One Terminal site or any other Terminals)*, OCT shall be deemed, contemporaneously with each such Capital Contribution made by Bluewing, to have made a Capital Contribution equal to five percent (5%) of such Bluewing Capital Contribution, and the Pro-Forma Percentage Interest of each Member shall adjust accordingly (each such amount deemed to have been contributed by OCT being referred to as an "Additional Carried Interest").

*Id.* at Section 7.2(b), (c) (emphasis added).

### D. The Company Procures a Loan to Fund Construction of the "Phase I Terminal" and the "Phase II Terminal."

In July 2019, the Company procured a loan from Cadence Bank (the "Loan") to fund the construction of fuel storage facilities at two new addresses on Old Texas Highway 48. The first new location, the "Phase II Terminal," is located at 10451 Old Texas Highway 48. That site, situated across the highway and to the west of 11700 Old Texas Highway 48 and 1005 Anchor Road, is labeled "C" on Exhibit 1 hereto.

The second new location, the "Phase III Terminal," is located at 10951 Old Texas Highway. That site, located to the north and east of 11700 Old Texas Highway 48 and 1005 Anchor Road, is labeled "D" on Exhibit 1 hereto.

**E. Midstream Issues a Capital Call to Repay the Loan, and the Parties Dispute OCT's Entitlement to Carried Interest.**

On June 9, 2022, Midstream issued a capital call to pay off the outstanding balance of the Loan, which the parties agree was used to fund the Phase II Terminal and the Phase III Terminal.

The June 9, 2022 capital call requested $4,175,500 from OCT. OCT paid $3,540,204, claiming entitlement to carried interest for the $635,296 balance. Disputing OCT's entitlement to carried interest on amounts used to repay the Loan that funded the Phase II Terminal and the Phase III Terminal (as opposed to the Bluewing One Terminal), Midstream paid the balance itself and asserted that the parties' interests in the Company automatically adjusted pursuant to Section 7.2(a)(iv) of the LLC Agreement.

**F. The Complaint and the Motion**

On August 8, 2022, OCT filed its Verified Complaint (the "Complaint"), seeking, among other things, a declaration "that OCT is entitled to carried interest based on funds paid by [Midstream] to repay borrowings used for *Bluewing One Terminal expansion*," and "that [Midstream] breached its contractual duties under the LLC Agreement to grant OCT carried interest based on funds paid by [Midstream] to repay borrowings used for *Bluewing One Terminal expansion*." Verified Compl. 21-22, Dkt. No. 1 (emphasis added). The Complaint also seeks an

9

injunction against further breaches of the LLC Agreement, as well as monetary damages.[5]

On November 1, 2022, Midstream filed the Motion, seeking "entry of summary judgment that (a) [OCT] is not entitled to carried interest based on funds paid by Midstream to repay borrowings for Bluewing One, LLC's expansion of terminals *adjacent to the Bluewing One Terminal* located at 11700 Old Texas Highway 48, Brownsville, Texas 78521, and (b) Midstream has not breached its contractual duties under the parties' operating agreement to grant [OCT] carried interest based on funds paid by Midstream to repay borrowings used for Bluewing One, LLC's expansion of terminals *adjacent to the Bluewing One Terminal* located at 11700 Old Texas Highway 48, Brownsville, Texas 78521." Def.'s Mot. for Partial Summ. J., Dkt. No. 16 (emphasis added).

On January 5, 2023, Vice Chancellor Glasscock heard oral argument on the Motion. Tr. of 1.5.23 Oral Arg., Dkt. No. 38. The matter was reassigned to me on February 15, 2023. Reassignment Letter, Dkt. No. 39.

---

[5] The Complaint asserts two counts: Count I for breach of contract against Midstream, and Count II for intentional interference with a contractual relationship against Energy Spectrum Partners VII LP ("Energy Spectrum"), an investor of Midstream. Verified Compl. ¶¶ 98-112. On September 9, 2022, Energy Spectrum moved to dismiss Count II, and on September 21, 2022, OCT voluntarily dismissed that count. Energy Spectrum Partners VII LP's Mot. to Dismiss, Dkt. No. 8; Notice of Voluntary Dismissal Without Prejudice, Dkt. No. 9.

## II.    ANALYSIS

The central question presented by the Motion is whether, under the unambiguous terms of the LLC Agreement, construction of the Phase II Terminal and the Phase III Terminal constituted "expansions" of the Bluewing One Terminal, such that OCT is entitled to carried interest on Midstream's capital contributions used to fund those projects, or if the Phase II Terminal and the Phase III Terminal are "other assets adjacent to the Bluewing One Terminal site," such that carried interest is not owed.  Each side contends that the LLC Agreement unambiguously compels its respective interpretation.

Delaware courts routinely enter "summary judgment in contract disputes where the language at issue is clear and unambiguous." *GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 783 (Del. 2012) (citations omitted).  "In such cases, the parol evidence rule bars the admission of evidence from outside the contract's four corners to vary or contradict that unambiguous language."[6]  *Id.*  On the other hand, "summary judgment may not be awarded [in a contract dispute] if the language is ambiguous and the moving party has failed to

---

[6] The LLC Agreement also contains a comprehensive integration clause providing that the LLC Agreement "supersedes all previous agreements, negotiations, or communications" between the parties.  LLC Agreement at Section 11.4.  Such provisions are enforceable, particularly where, as here, they are the result of negotiations by sophisticated parties. *See Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*, 2002 WL 1558382, at *10-11 (Del. Ch. July 9, 2002).

11

offer uncontested evidence as to the proper interpretation." *Id.* "[A] contract term is ambiguous 'only when the provisions in controversy are reasonable or fairly susceptible of different interpretations or may have two or more different meanings.'" *Comet Sys., Inc. Shareholders' Agent v. MIVA, Inc*., 980 A.2d 1024, 1030 (Del. Ch. 2008).

For the reasons set forth below, I find that the plain language of the LLC Agreement unambiguously supports Midstream's interpretation, and therefore recommend that the Motion be granted.

### A. The LLC Agreement Unambiguously Defines the Bluewing One Terminal as the Facility Located at 11700 Old Texas Highway 48 and Not Any Other Assets Adjacent to That Site.

"A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, an ambiguity exists [w]hen the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings." *GMG Capital Investments, LLC*, 36 A.3d at 780.

The parties here agree that the definition of "Bluewing One Terminal" is unambiguous,[7] but disagree on its meaning. Midstream argues that the LLC Agreement unambiguously defines "Bluewing One Terminal" as the facility located at 11700 Old Texas Highway 48, and not any other location. OCT counters that the

---

[7] *See, e.g*., Tr. of 1.5.23 Oral Arg. 33:12-16, Dkt. No. 38.

12

definition of "Bluewing One Terminal" contemplates that the facility "may be expanded," which could include geographic expansion beyond the Bluewing One Terminal's initial location at 11700 Old Texas Highway 48.

As explained below, Midstream offers a compelling interpretation of the definition of "Bluewing One Terminal" as limited to a specific location. On the other hand, OCT's argument that "expanded" must include geographic expansion is not convincing. And, most importantly, reading the LLC Agreement as a whole, the carried interest provisions in Sections 7.2(b) and (c) expressly conflict with OCT's interpretation, rendering it unreasonable.

**1. The Definition of "Bluewing One Terminal" is Limited to a Specific Location, Namely 11700 Old Texas Highway 48.**

In briefing, OCT and Midstream each carefully dissect the LLC Agreement's text, arriving at opposite outcomes.

To recap, under the LLC Agreement, OCT is only entitled to carried interest on Midstream's capital contributions that are "directly and solely related to the Bluewing One Terminal" and that are made "for the sole purpose of funding capital expenditures to expand or improve the Bluewing One Terminal (as opposed to . . .

13

any other assets adjacent to the Bluewing One Terminal site or any other Terminals),"[8] where the "Bluewing One Terminal" is defined as:

> [T]he marine terminal, tank farm and related facilities and infrastructure *located at 11700 Old Texas 48, Brownsville, Texas 78521* and serving the Port of Brownsville, Texas to be owned by Bluewing One, as such facility exists as of the Effective Date, and as the same may be expanded, modernized, de-bottlenecked, improved, refurbished, repaired or otherwise modified or altered following the Effective Date . . . .

LLC Agreement at Section 1.1 (emphasis added).

Midstream argues that the LLC Agreement defines the "Bluewing One Terminal" as "the marine terminal, tank farm and related facilities and infrastructure located at 11700 Old Texas 48, Brownsville, Texas 78521"—confining the Bluewing One Terminal to assets at a fixed location on the globe. Def.'s Opening Br. in Supp. of Mot. for Partial Summ. J. 28-29, Dkt. No. 16 (emphasis omitted) [hereinafter, the "OB"]. The definition also clarifies that the Bluewing One Terminal includes "such facility"—*i.e.*, the assets located at 11700 Old Texas Highway 48—as it "exists as of the Effective Date, and as the same [assets located at 11700 Old Texas Highway 48] may be expanded, modernized, de-bottlenecked, improved, refurbished, repaired or otherwise modified or altered following the Effective Date." *Id.* In other words, while the Bluewing One Terminal facility at

---

[8] LLC Agreement at Section 7.2(a)(i); *id.* at Section 7.2(b)-(c).

11700 Old Texas Highway 48 may change over time, the location of that facility remains fixed.

Midstream's reading makes sense. If the parties had intended for the location of the Bluewing One Terminal to change over time, they could have so provided. For example, the parties could have defined the Bluewing One Terminal as "the marine terminal, tank farm and related facilities and infrastructure *currently* located at 11700 Old Texas 48 . . . as the same may be expanded," but they did not. As written, the definition of "Bluewing One Terminal" supports Midstream's position that the location at 11700 Old Texas Highway 48 remains fixed, while the facility at that location "may be expanded . . . ."

OCT parses the language differently. OCT contends that in the phrase "the marine terminal, tank farm and related facilities and infrastructure located at 11700 Old Texas 48," the modifier "located at 11700 Old Texas 48" applies only to the last antecedent, "infrastructure." Pl.'s Answering Br. in Opp'n to Def.'s Mot. for Partial Summ. J. 14-15, Dkt. No. 23 [hereinafter, the "AB"]. Thus, under OCT's reading, only the location of "the then-existing infrastructure" remains fixed at 11700 Old Texas Highway 48, while the location of other assets associated with the Bluewing One Terminal may expand over time.

Under the "rule of the last antecedent," "referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent."

15

*Daniel v. Hawkins*, 2023 WL 115854, at *28 (Del. Jan. 6, 2023). On the other hand, "'[w]hen the sense of the entire [document] requires that a qualifying word or phrase apply to several preceding or succeeding sections, the word or phrase will not be restricted to its immediate antecedent.'" *NBC Universal v. Paxson Commc'ns Corp*., 2005 WL 1038997, at *6 (Del. Ch. Apr. 29, 2005). Here, OCT concedes that the second half of the modifying phrase—"*to be owned by Bluewing One*[*, LLC*]"[9]— does, in fact, apply to all listed antecedents.[10] In other words, even OCT seems to agree that straightforwardly applying the last antecedent rule here does not accurately capture the parties' intent.[11]

In my view, the better, commonsense reading is the one that Midstream proposes: that the entire phrase "located at 11700 Old Texas 48, Brownsville, Texas 78521 and serving the Port of Brownsville, Texas to be owned by Bluewing One,"

---

[9] Again, the entire modifying phrase is: "the marine terminal, tank farm and related facilities and infrastructure *located at 11700 Old Texas 48, Brownsville, Texas 78521 and serving the Port of Brownsville, Texas to be owned by Bluewing One . . . .*"

[10] *See* AB at 14-15 (contending that "(1) 'the marine terminal,' (2) 'tank farm and related facilities,' and (3) 'infrastructure located at 11700 Old Texas 48, Brownsville, Texas 78521 and serving the Port of Brownsville, Texas'" were all "'to be owned by Bluewing One[, LLC]'").

[11] Even if the last antecedent rule applied, I am not convinced OCT is applying it correctly. The presence of two coordinating conjunctions in the phrase "the marine terminal, tank farm *and* related facilities *and* infrastructure," instead of a comma between "tank farm" and "related facilities," suggests that "located at 11700 Old Texas 48" modifies the phrase "related facilities and infrastructure," rather than "infrastructure" alone.

16

is intended to modify the entire phrase "the marine terminal, tank farm and related facilities and infrastructure."   Under that reading, the Bluewing One Terminal's facility at 11700 Old Texas Highway 48 may expand over time, but the "Bluewing One Terminal" itself is limited to that location.

**2. OCT's Argument that "Expanded" Requires Geographic Expansion is Not Persuasive.**

As summarized above, the "Bluewing One Terminal" is defined as "the marine terminal, tank farm and related facilities and infrastructure located at 11700 Old Texas 48 . . . as the same may be expanded, modernized, de-bottlenecked, improved, refurbished, repaired or otherwise modified or altered . . . ."

OCT argues that the word "expanded" must permit geographic expansion beyond the Bluewing One Terminal's initial location at 11700 Old Texas Highway 48.  According to OCT, interpreting "expanded" to mean expansion at the existing facility, as opposed to geographic expansion, would render the term superfluous, since an "expansion" at the existing location would also constitute an "improvement."[12]  *See* AB at 17 ("Taken together, 'improved' must mean something different than—and distinct from—'expanded.'").  *See also NAMA Holdings, LLC*

---

[12] OCT also points out that the LLC's carried interest provisions, Sections 7.2(b) and (c), limit carried interest to "capital expenditures to *expand* or *improve* the Bluewing One Terminal," similarly arguing that "expand" and "improve" must be interpreted as having different meanings.  LLC Agreement at Section 7.2(b), (c) (emphasis added).

*v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007) ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court."), *aff'd*, 945 A.2d 594 (Del. 2008).

This argument is not persuasive. First, the concepts of "expansion" and "improvement" at an existing facility are not coterminous. OCT's argument requires applying the real property definition of improvement—"[t]o develop (land)"[13]—in a contract that is not a real property transfer document.[14] Applying the more common usage of "improve"—"to increase the value or enhance the appearance of (something)"[15]—the terms "expanded" and "improved" have distinct meanings. For instance, contrary to OCT's argument, an expansion of the storage capacity of an existing terminal does mean something different than an improvement in the value of that terminal.

---

[13] *Improve*, Black's Law Dictionary (11th ed. 2019).

[14] Tr. of 1.5.23 Oral Arg. 47:1-2. *See also* AB at 17 ("Whereas 'expansions' are enlargements of the geographic footprint, 'improvements' refer to developing that footprint . . . .").

[15] *Improve*, Black's Law Dictionary (11th ed. 2019).

OCT's argument also fails to acknowledge that *most* of the listed adjectives—including "modernized," "de-bottlenecked,"[16] "refurbished," "repaired," *and* "expanded"—could be characterized as "improvements" to the existing facility. As Vice Chancellor Glasscock noted at oral argument, the definition includes a catch-all "list that a lawyer would make of all the things you could call construction on a property." Tr. of 1.5.23 Oral Arg. 46:3-5. But "reading [the contract] as a normal human being, I would expect expansion, like all these other adjectives, to relate to the physical location which has been described." *Id*. at 39:6-11.

Accordingly, the plain language of the LLC Agreement does not support OCT's argument that the definition of Bluewing One Terminal must allow for geographic expansion.

### 3. Sections 7.2(b) and (c) of the LLC Agreement Render OCT's Interpretation Unreasonable.

Even if the Bluewing One Terminal definition standing alone were susceptible to OCT's interpretation, any potential ambiguity is entirely foreclosed by the other provisions of the LLC Agreement. "[W]ell-settled rules of contract construction

---

[16] In the oil and gas industry, de-bottlenecking refers to the process of identifying and optimizing areas or equipment that limit the flow of product. *See Debottlenecking: What It Is and How It Can Help Optimize Downstream Processes*, Audubon Companies (Aug. 21, 2014), https://auduboncompanies.com/debottlenecking-what-it-is-and-how-it-can-help-optimize-downstream-processes/.

19

require that a contract be construed as a whole, giving effect to the parties' intentions." *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005); *see also Council of Dorset Condo. Apartments v. Gordon*, 801 A.2d 1, 7 (Del. 2002) ("A court must interpret contractual provisions in a way that gives effect to every term of the instrument, and that, if possible, reconciles all of the provisions of the instrument when read as a whole."). Read as a whole, the LLC Agreement unambiguously demonstrates the parties' intent to permit carried interest *only* on capital contributions used to expand or improve the Bluewing One Terminal facility at 11700 Old Texas Highway 48, and *not* for any other assets near or close to[17] that location.

Several provisions of the LLC Agreement demonstrate that the parties anticipated an expansion of the Company through the acquisition of assets other than the Bluewing One Terminal and the Bluewing Royal Terminal. The LLC Agreement defines the Company's "Business" to include "the receipt, redelivery, storage, throughput, and terminalling of hydrocarbons and hydrocarbon-derived products at the Terminals," defined as the two existing terminals plus "*any other marine terminal, tank farm and related facilities and infrastructure . . . that is acquired after the [LLC Agreement's] Effective Date[.]*" LLC Agreement at Section 1.1

---

[17] Black's Law Dictionary defines "adjacent" to mean "[l]ying near or close to, but not necessarily touching." *Adjacent*, Black's Law Dictionary (11th ed. 2019).

(emphasis added). Additionally, pursuant to Section 7.2(a)(i), the Managing Member is authorized to issue capital calls to fund "capital expenditures related to any of the Terminals and *any other Approved Project*." *Id*. at Section 7.2(a)(i) (emphasis added). Thus, the parties clearly contemplated the possibility of acquiring additional terminals or facilities, or undertaking other projects, not encompassed by the Bluewing One Terminal.

Given that possibility, the LLC Agreement carefully delineates the circumstances in which OCT will, and will not, receive carried interest. Specifically, Sections 7.2(b) and (c) are clear that while OCT will receive carried interest on Midstream's capital contributions used "for the sole purpose of funding capital expenditures to expand or improve the Bluewing One Terminal," OCT will *not* receive carried interest for expenditures pertaining to "any other assets adjacent to the Bluewing One Terminal site."[18] LLC Agreement at Section 7.2(b), (c). In other words, these provisions unambiguously demonstrate "that the parties contemplated acquiring other terminals 'adjacent' to the Bluewing One Terminal site *and that those subsequently acquired terminals* [*would*] *not qualify for carried interest*

---

[18] OCT and Midstream agree that the Bluewing One Terminal "site" refers to the Bluewing One Terminal's geographic location "as it existed when the LLC Agreement went into effect"—*i.e.*, 11700 Old Texas Highway 48. OB at 23; *see also* AB at 10.

21

regardless of their close physical proximity to the Bluewing One Terminal." OB at 11 (emphasis added).

"An interpretation that conflicts with the plain language of a contract is not reasonable." *Bank of New York Mellon v. Commerzbank Cap. Funding Tr. II*, 65 A.3d 539, 555 (Del. 2013). And, "[a] meaning inferred from a particular provision cannot control if that inference conflicts with the agreement's overall scheme." *Weinberg v. Waystar, Inc.*, 2022 WL 2452141, at *3 (Del. Ch. July 6, 2022), *judgment entered*, (Del. Ch. 2022). Notwithstanding the exclusionary parentheticals in Sections 7.2(b) and (c), OCT interprets the LLC Agreement to mean that the Bluewing One Terminal could geographically expand to a parcel near 11700 Old Texas Highway 48, entitling OCT to carried interest on expenditures *even if* they pertain to "other assets adjacent to the Bluewing One Terminal site."[19] OCT's interpretation directly contradicts the plain language of Sections 7.2(b) and (c), which make clear that carried interest in *not* available in that circumstance, and is therefore unreasonable.

---

[19] OCT argues that the carveout of "any *other* assets adjacent to the Bluewing One Terminal site" in Sections 7.2(b) and (c) demonstrates the parties' intention that *some* adjacent assets could be included in the definition of "Bluewing One Terminal." AB at 23-24 (emphasis added). A less convoluted reading is that the parties simply intended to distinguish between the Bluewing One Terminal, on the one hand, and other assets (including assets adjacent to the Bluewing One Terminal site), on the other hand.

In sum, reading the LLC Agreement as a whole and giving meaning to all provisions therein, the "Bluewing One Terminal" unambiguously refers to the facility located at 11700 Old Texas Highway 48, and cannot include other assets adjacent to that location. Thus, the Phase II Terminal, which is located at 10451 Old Texas Highway 48, and the Phase III Terminal, which is located at 10951 Old Texas Highway 48, are not "expansions" of the Bluewing One Terminal—they are "other assets adjacent to the Bluewing One Terminal site." Based on the unambiguous terms of the LLC Agreement, OCT is not entitled to carried interest on Midstream's capital contributions used to fund those projects.

### B. OCT is Not Entitled to Carried Interest on MidStream's Capital Contribution Used to Repay the Loan.

Midstream separately argues that even if the Loan were used to improve or expand the Bluewing One Terminal, OCT is not entitled to carried interest on Midstream's capital contribution used to repay the Loan because "[r]epaying bank debt is not the same as making an expenditure 'directly and solely' for the improvement or expansion of any storage Terminal." OB at 34-35. Because the parties agree that the proceeds of the Loan were used to fund construction of the Phase II Terminal and the Phase III Terminal, which I have concluded are not expansions of the Bluewing One Terminal, I do not reach this alternative argument.

## III. CONCLUSION

For the reasons explained above, I recommend that the Motion be granted.

This is a final report pursuant to Court of Chancery Rule 144.

## Exhibit 1*



* This exhibit is intended to illustrate the respective locations of the terminals for the reader's general understanding. It is not intended as a finding of fact regarding the boundary of any terminal location.